[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-12754
Non-Argument Calendar
_____

D.C. Docket No. 8:18-cr-00525-JSM-TGW-3

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

GERLIN RUTILIO IBARGUEN VALENCIA,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(July 28, 2020)

Before BRANCH, LAGOA, AND FAY, Circuit Judges.

LAGOA, Circuit Judge:

Gerlin Rutilio Ibarguen Valencia ("Valencia") appeals his 140-month sentence for conspiracy to possess with intent to distribute five kilograms or more of cocaine aboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a), 70506(a) and (b), and 21 U.S.C. § 960(b)(l)(B)(ii), and aiding and abetting to possess with intent to distribute five kilograms or more of cocaine aboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a), 70506(a) and (b), 18 U.S.C. § 2, and 21 U.S.C. § 960(b)(l)(B)(ii). Valencia challenges the district court's denial of a minor-role reduction under U.S.S.G. § 3B1.2(b) and the district court's denial of safety-valve relief. We affirm the denial of safety-valve relief, but we vacate and remand for resentencing as to Valencia's entitlement to a minor-role reduction.

## I.    FACTUAL AND PROCEDURAL HISTORY

On or about October 20, 2018, the U.S. Coast Guard ("Coast Guard") intercepted in international waters a go-fast vessel approximately 240 nautical miles southwest of the El Salvador-Guatemala border.[1] The Coast Guard boarding team discovered approximately sixty-five bales of cocaine, which weighed approximately

---

[1] Pursuant to the United States-Colombian Bilateral Agreement, the Coast Guard requested from the Government of Colombia confirmation of the registry and nationality of the go-fast vessel. The Government of Colombia was unable to confirm or deny that the vessel was of Colombian nationality. Additionally, the go-fast vessel was not flying a flag, had no name, registration numbers, homeport, or other markings on the hull. Because the vessel was one without nationality and was interdicted in international waters, the go-fast vessel was properly subject to the jurisdiction of the United States.

2,040 kilograms, aboard the vessel and arrested the three crewman onboard: Henry Bonilla Arias ("Arias"), the captain; Orlando Victoria Valoy ("Valoy"), a mariner; and Valencia, the mechanic.  On October 31, 2018, a grand jury returned a two-count indictment against the crewmen.  The indictment charged the crewmen with conspiracy to possess with intent to distribute five kilograms or more of cocaine aboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a), 70506(a) and (b), and 21 U.S.C. § 960(b)(l)(B)(ii), and aiding and abetting to possess with intent to distribute five kilograms or more of cocaine aboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a) and 70506(a) and (b), 18 U.S.C. § 2, and 21 U.S.C. § 960(b)(l)(B)(ii).  The statutory maximum term of imprisonment for these criminal offenses is life.  § 960(b)(1)(B)(ii).

Arias and Valoy pleaded guilty to the charges in the two-count indictment. Arias was sentenced to 180-months of imprisonment and sixty months of supervised release.[2]  Valoy was sentenced to 120-months of imprisonment and sixty months of supervised release.

Valencia was interviewed by federal agents on November 4, 2018, and February 6, 2019, and discussed his involvement in the drug smuggling venture and,

---

[2] As noted in the presentence investigation report, Arias received a two-level enhancement for his role as the captain of the vessel.

notably, the identity of the man who recruited him to transport the cocaine. Without a plea agreement, Valencia pleaded guilty to both counts in the indictment on February 27, 2019.

Based on the amount of cocaine seized from the vessel, Valencia's presentence investigation report set his base offense level at thirty-eight. *See* U.S.S.G. § 2D1.1. Because Valencia accepted responsibility for his actions, his base offense level was reduced by three levels, resulting in a total offense level of thirty-five. *See* U.S.S.G. § 3E1.1. This total offense level, coupled with a criminal history category of I, created a guideline sentencing range of 168 to 210 months imprisonment. *See* U.S.S.G. Sentencing Table, ch. 5, pt. A.

Valencia made two objections to the presentence investigation report. First, Valencia argued that he should have received a minor-role reduction under U.S.S.G. §§ 2D1.1(a)(5)(B)(iii) and 3B1.2(b). He contended that he played a minor role in the drug smuggling venture because he was merely a crewman aboard the vessel and did not have any proprietary interest in the larger criminal activity. Second, Valencia argued that he should have received a two-level reduction for safety-valve relief under 18 U.S.C. § 3553(f).[3] Relevant to this appeal, Valencia contended that he

---

[3] The safety-valve provision of 18 U.S.C. § 3553(f) allows a district court to disregard a defendant's statutory mandatory minimum sentence and afford a defendant a two-level reduction if the defendant meets the five criteria specified in § 3553(f)(1)-(5). *See* U.S.S.G. §§ 2D1.1(b)(18), 5C1.2.

provided full and truthful information to the federal agents regarding his involvement in the criminal activity and the identity of his recruiter.

The district court addressed Valencia's objections during the sentencing hearing. During the hearing, the district court asked the government why Valencia was not entitled to safety-valve relief. The government responded that Valencia, during his interviews with the federal agents, "was not completely truthful, and withheld information with respect to the individual or individuals who hired him" to transport the cocaine. Moreover, the government argued that Valencia's recollections were riddled with "internal inconsistencies and frankly, some things that just don't add up." Valencia argued that he provided the federal agents with a consistent narrative and was truthful in his inability to remember his recruiter's name. Valencia informed the district court that he would take the witness stand so the district court could "evaluate his credibility" regarding his involvement in the criminal activity and his contentions about his recruiter.

During his testimony, Valencia recounted that when he was in Buenaventura, Colombia, a man approached him and asked whether Valencia could assist him with an engine issue. Valencia described the man as looking Guatemalan and being "175 tall, a little chubby," "between thirty-five and thirty-seven years old," with a "cinnamon tone." The man was wearing a flat cap and dark sunglasses. After fixing the engine and receiving $15 as payment, Valencia testified that the man asked him

5

whether he was interested in another, unspecified job. According to Valencia, the job came with conditions that included not asking the man questions, following orders, and forgetting that his conversation with the man occurred. The man originally offered Valencia $8,000 upfront, but Valencia negotiated the price to $9,000. Since he was in "bad shape" and "really needed the money," Valencia testified that he agreed to the offer and did not "really think about the consequences." Valencia stated that he received $9,000 the following day and boarded a "small boat" near Marina Del Sol that brought him to the go-fast vessel. When Valencia boarded the go-fast vessel, he joined Arias and Valoy and was told to "give the engine full throttle, full speed ahead." According to Valencia, the recruiter gave Valencia his name, but "his name didn't register in [Valencia's] brain." Valencia further testified that he did not know the amount of money he would receive when he successfully returned after delivering the cocaine.

After the district court briefly questioned Valencia, the government questioned him about his involvement in the criminal activity and his conversations with federal agents. Valencia testified that his recruiter offered him an unspecified amount of money after he successfully completed his job, and Valencia stated that he did not know that the job involved transporting drugs. According to Valencia, his job was "just [to] watch over the engine and to help, you know, navigate" the vessel. The government asked Valencia about his conversations with the federal

6

agents.     Regarding  his  interview  with  federal  agents  in  November  2018,  the

government asked:

> Q.  And when you spoke to the agents on that occasion, you told them
> that you were offered work under the condition that you didn't ask any
> questions and agreed to never disclose the person who hired you his
> identity, isn't that right?
>
> A.  Of that, no because he just told me that I did not know who he was.
> He said he had not seen me and you don't know me.
>
> Q. Now, you've given some details, a description of the individual you
> say hired you, here in court today.  Do you recall that testimony?
>
> A.  Yes.
>
> Q.  You didn't provide that information to the agents when you were
> interviewed on November the 4th of last year, did you?
>
> A.  Well, they did not ask me that.
>
> . . . .
>
> Q.  During that interview on November the 4th of last year, 2018, you
> didn't tell the agents that this individual who hired you actually gave
> you his name, did you?
>
> A.  No.
>
> Q.  In fact, you told them that you didn't know his name?
>
> A.  Yeah, because I don't know it.

Regarding his February 2019 interview, Valencia was asked the following:

> Q.  And during that interview you all spoke about the person who hired
> you for this job?
>
> A.  Yes. Well, they asked me.

7

Q.  And during that interview you didn't provide the description that you provided here in court today.

A.  No, because when we meet they asked me where I had left from or who sent me, if I knew the place.  Then also, they showed me two pictures and showed me if I knew these people and I did not know them.  I did not know the place.  They asked me if I were to see them in the pictures if I would recognize them and I said yes.

. . .

Q.  And during your interview on February the 6th of this year, 2019, you also—you didn't tell the agents that the individual—you knew—excuse me, the individual who hired you gave you his name either, correct?

A.  Y-e-s.  He did not give me his name.

After the government's cross-examination, the district court questioned Valencia about his recruiter's identity and how Valencia was to receive the remainder of his compensation.  Valencia testified that he could not remember his recruiter's name and did not have the ability to locate him.  Valencia also testified that he provided his recruiter with his nickname, a copy of his national identification card, and cell phone number.  When the district court asked how he would be able to collect his payment after successfully transporting the cocaine, Valencia responded that he had to trust his recruiter would provide the payment.  After the district court finished questioning Valencia, the court denied Valencia's request for safety-valve relief.

8

The district court then heard arguments about Valencia's minor-role reduction request. The government argued that Valencia did not prove that he was substantially less culpable than Arias, the captain, and Valoy, the mariner. Moreover, the government argued that each crewman was similarly culpable, since "[o]n a small boat like [the go-fast vessel] that travel[ed] hundreds, sometimes thousands of miles, through the open ocean everybody has a job to do." Valencia argued that the role of his recruiter should be considered when determining whether Valencia played a minor role in the criminal activity. If providing information regarding the members of the larger conspiracy was material to the safety-valve relief, Valencia argued that it should also be material to his minor-role reduction. In response, the district court stated "[w]ell, I normally give minor roles to mariners, but not to the mechanic and not to the captain. So I'm going to deny the request for minor role."

The district court then stated "I will vary downward from the guidelines because, in keeping [Valencia] in somewhat relative position to the mariner on the boat [Valoy], I think I gave him 120 months, I'm going to give Mr. [Valencia] 140 months." The district court sentenced Valencia to 140-months incarceration, five years of supervised release, and $200 of special assessments. Valencia filed a timely notice of appeal.

## II.    STANDARD OF REVIEW

We review a district court's denial of a minor-role reduction for clear error. *United States v. Cruickshank*, 837 F.3d 1182, 1192 (11th Cir. 2016).    "When reviewing the denial of safety-valve relief, we review for clear error a district court's factual determinations" and "review de novo the court's legal interpretation of the statutes and sentencing guidelines."  *United States v. Johnson*, 375 F.3d 1300, 1301 (11th Cir. 2004) (per curiam).

## III.    ANALYSIS

Valencia argues that the district court clearly erred in denying his request for a minor-role reduction and his request for safety-valve relief.  We discuss each argument in turn.

### A.    MINOR-ROLE REDUCTION

Under U.S. Sentencing Guideline § 3B1.2(b), a defendant who is a "minor participant" in the underlying criminal activity is entitled to a two-level reduction.[4] A defendant is a "minor participant" when he is "less culpable than most other participants in the criminal activity, but whose role could not be described as minimal."  U.S.S.G. § 3B1.2 cmt. n.5.  When analyzing a minor-role reduction,

---

[4]  Under Sentencing Guideline § 2D1.1(a)(5)(B)(iii), however, if a district court in a drug case grants a reduction under U.S.S.G. § 3B1.2 to a defendant with a base offense level of 38, the district court may decrease the base offense level by four additional levels for a total reduction of six levels.  Here, Valencia's base offense level was 38.

districts courts should follow the principles articulated by this Court in *United States v. De Varon*, 175 F.3d 930, 940 (11th Cir. 1999) (en banc).  In *De Varon*, we instructed district courts to consider "first, the defendant's role in the relevant conduct for which [he] has been held accountable at sentencing, and, second, [his] role as compared to that of other participants in [his] relevant conduct."  *Id.*  "These principles advance both the directives of the Guidelines and our case precedent by recognizing the fact-intensive nature of this inquiry and by maximizing the discretion of the trial court in determining the defendant's role in the offense."  *Id.* at 934.  Importantly, "district court[s] should look to other participants only to the extent that they are identifiable or discernable from the evidence" and "may consider only those participants who were involved in the relevant conduct attributed to the defendant."  *Id.* at 944.  "The conduct of participants in any larger criminal conspiracy," however, "is irrelevant."  *Id.*

The Guidelines are also instructive. The commentary to § 3B1.2 counsels district courts to consider the totality of the circumstances and provides a non-exhaustive list of factors for the sentencing court to consider: (1) "the degree to which the defendant understood the scope and structure of the criminal activity"; (2) "the degree to which the defendant participated in planning or organizing the criminal activity"; (3) "the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority"; (4) "the nature

11

and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts"; and (5) "the degree to which the defendant stood to benefit from the criminal activity."  U.S.S.G. § 3B1.2 cmt. n.3(C)(i)-(v). The commentary also notes that "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline," and "[t]he fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative."  *Id.* § 3B1.2 cmt n.3(C).  "Such a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity."  *Id.*

Accordingly, this is a fact-intensive inquiry where "no one factor is 'more important than another.'"  *Cruickshank*, 837 F.3d at 1195 (quoting *De Varon*, 175 F.3d at 945).  Therefore, district courts cannot deny a defendant's minor-role reduction by considering only one factor.  In *Cruickshank*, for example, the district court denied the defendant's minor-role reduction based solely on the sizable quantity of drugs the defendant transported during the underlying criminal activity. *Id.* at 1194–95.  While drug quantity is a factor that district courts should consider, we vacated the defendant's sentence and remanded for resentencing because "it was legal error for the district court to say that this is the *only* factor to be considered in

12

a case like this one." *Id.* at 1195 (emphasis in original);  *see also United States v. Presendieu*, 880 F.3d 1228, 1244, 1250 (11th Cir. 2018) (holding that a district court should not have solely considered one factor when denying the defendant's minor-role reduction).

Still, the defendant has the burden to prove, by a preponderance of the evidence, that a minor-role reduction is warranted. *De Varon*, 175 F.3d at 934.  And "[s]o long as the basis of the [district] court's decision is supported by the record *and* does not involve a misapplication of a rule of law, we believe that it will be rare for an appellate court to conclude that the sentencing court's determination is clearly erroneous." *Id.* at 945 (emphasis in original).

Valencia argues that the district court's denial of his minor-role reduction was clearly erroneous based on two grounds.  First, Valencia argues that the district court "applied a per se rule that depended on a single fact."  Valencia contends that, instead of assessing the totality of the circumstances, the district court denied his minor-role reduction based solely on his role as a mechanic.  Valencia argues that the district court should have considered that he was a paid crew member hired to complete his task and that he did not plan or organize the criminal activity, did not recruit others to join the criminal activity, had no part in choosing the boat, did not prepare the boat for journey, did not chart the boat's course, did not understand the scope and structure of the larger criminal operation, and did not exercise any influence or

13

decision-making authority.  Second, Valencia argues that the district court failed to consider the role and conduct of a high-level participant—his recruiter—in the underlying criminal activity.  Valencia argues that his recruiter, unlike himself, was a leader or organizer in the larger criminal operation.  Valencia further contends a minor role reduction is warranted because he was less culpable than his recruiter and Arias, the captain.  Accordingly, Valencia asks this Court to vacate his sentence and remand for resentencing.

While the government acknowledges that district courts should not apply *per se* rules against defendants when considering minor-role reductions, the government argues that Valencia did not provide sufficient evidence to prove that he is entitled to a reduction.  The government contends that Valencia's conduct can only be compared to that of Arias and Valoy—and not Valencia's recruiter.  The government argues that because Valencia has not presented evidence that he is less culpable than Valoy, he cannot prove by a preponderance of the evidence that a minor-role reduction is warranted.

A review of the record shows that in denying Valencia's minor-role reduction, the district court considered only one factor when denying Valencia's minor-role reduction. Specifically, the district court stated: "[w]ell, I normally give minor roles to mariners, but not to the mechanic and not to the captain.  So I'm going to deny the request for minor role."  While Valencia's job title aboard the vessel is a

14

permissible factor that the district court should have considered, *see* § 3B1.2 cmt. n.3(C)(iv), this Court's precedent and the commentary to § 3B1.2 instruct district courts to consider the totality of the circumstances when addressing a minor-role reduction request. *See Presendieu*, 880 F.3d at 1250; *Cruickshank*, 837 F.3d at 1194–95; *De Varon*, 175 F.3d at 934; *see also* § 3B1.2 cmt. n.3(C).

Because the record shows that the district court considered only one factor in analyzing whether to grant or deny Valencia's minor role reduction, "we think the wisest course of action is to vacate the district court's decision and remand for resentencing." *Cruickshank*, 837 F.3d at 1195.   On remand, the district court should examine Valencia's role in the relevant criminal conduct based on the totality of the circumstances and based on the relevant factors articulated in *De Varon* and in the commentary to U.S.S.G. § 3B1.2. *See Presendieu*, 880 F.3d at 1250.  This Court's decision does not express an opinion as to Valencia's ultimate entitlement to a minor role adjustment, but rather only directs the district court to make the requisite factual findings in regard to the other relevant factors beyond Valencia's role aboard the vessel.

### B.    SAFETY-VALVE RELIEF

"Safety-valve relief allows for sentencing without regard to any statutory minimum, with respect to certain offenses, when specific requirements are met." *United States v. Brehm*, 442 F.3d 1291, 1299 (11th Cir. 2006) (per curiam). Under

15

U.S. Sentencing Guideline § 5C1.2, which incorporates the criteria set forth in 18

U.S.C. § 3553(f), the specific requirements are:

> (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines before application of subsection (b) of § 4A1.3 (Departures Based on Inadequacy of Criminal History Category);

> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

> (3) the offense did not result in death or serious bodily injury to any person;

> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848; and

> (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

If all five criteria are met, the defendant is entitled to a two-level reduction in his

guideline offense level. U.S.S.G. § 2D1.1(b)(18).

Under the fifth requirement, which is referred to as a "tell-all" provision, *see*

*United States v. Yate*, 176 F.3d 1309, 1310 (11th Cir. 1999) (per curiam), a defendant

must "truthfully and fully disclose information within [his] knowledge relating to

the crime for which [he] is being sentenced," *United States v. Figueroa*, 199 F.3d 1281, 1283 (11th Cir. 2000) (per curiam).  "[A] defendant who previously lied or withheld information from the government" is not "automatically disqualified from safety-valve relief" as long  as the defendant makes a complete and truthful proffer not later than the commencement of the sentencing hearing.  *United States v. Brownlee*, 204 F.3d 1302, 1304–05 (11th Cir. 2000).  But "[t]his does not mean that the defendant's prior lies are completely irrelevant. . . .  [T]he evidence of his lies becomes 'part of the total mix of evidence for the district court to consider in evaluating the completeness and truthfulness of the defendant's proffer.'"  *Id.* at 1305 (quoting *United States v. Schreiber*, 191 F.3d 103, 108 (2d Cir. 1999)).

The district court, in turn, must independently assess the underlying facts and cannot merely rely on the government's representation of the facts.  *See United States v. Espinosa*, 172 F.3d 795, 797 (11th Cir. 1999) (per curiam).  The district court has "the responsibility for determining the truthfulness of the information the defendant provided to the [g]overnment."  *Id.*  The defendant bears the burden to prove that he is eligible for safety-valve relief, and "[t]he burden is on the defendant to come forward and to supply truthfully to the government all the information that he possesses about his involvement in the offense, including information relating to the involvement of others and to the chain of the narcotics distribution."  *United States v. Cruz*, 106 F.3d 1553, 1557 (11th Cir. 1997).

17

Both parties acknowledge that Valencia satisfied the first four requirements. Valencia argues that he also satisfied the fifth requirement, claiming that he did not withhold any information from the government. Although he was asked about his recruiter's name, Valencia contends that he has been consistently unable to remember his recruiter's name. He argues that the government cannot deny safety-valve relief based on this lack of information. Moreover, Valencia argues that the district court, in its terse ruling, failed to make a finding of fact as to his credibility and simply deferred to the government's arguments. Valencia asserts that this warrants a remand.

The government argues that Valencia produced inconsistent and incredible testimony. Specifically, it argues that Valencia: inconsistently testified about knowing, or failing to know, his recruiter's name; withheld the physical appearance of his recruiter from the federal agents; and produced an incredible story about participating in a drug-trafficking venture without knowing his recruiter's name or knowing how to contact him.

We find the government's arguments more persuasive.[5] First, we do not believe that the district court simply deferred to the government's arguments and

_____

[5] For purposes of this appeal, we assume that Valencia, a defendant convicted for offenses under 46 U.S.C. §§ 70503 and 70506, is eligible for safety-valve relief. Before the First Step Act of 2018, a defendant convicted for these criminal offenses was not eligible for safety-valve relief. *See United States v. Pertuz—Pertuz*, 679 F.3d 1327, 1328 (11th Cir. 2012) (per curiam). The First Step Act of 2018 amended 18 U.S.C. § 3553(f) to include Maritime Drug Law Enforcement Act offenses. Pub. L. No. 115-391, § 402(a)(1)(A)(ii), 132 Stat. 5194, 5221 (adding offenses

failed to make a credibility determination.  We note that the district court actively questioned Valencia after direct and cross examinations and heard both parties' safety-valve arguments.  Indeed, Valencia himself stated that the purpose of his testimony during the sentencing hearing was to allow the district court to "evaluate his credibility."  Second, although Valencia argues that the district court should have explained its reasons for denying his safety-valve relief, the record supports the district court's decision.  *Cf. United States v. Miles*, 290 F.3d 1341, 1352 (11th Cir. 2002) (per curiam).  There was evidence in the record to support a determination that Valencia was not credible.  Although Valencia contends that he cannot remember his recruiter's name or how to contact him, his large compensation, the quantity of the drugs being transported, the express job condition that required Valencia to "forget" his encounter with his recruiter, and Valencia's claims that he did not know how to contact his recruiter in order to receive the second half of his compensation upon successful delivery of the cocaine, belie that contention.

Finally, the record also evidences that Valencia failed to provide federal agents with complete and truthful information.  Valencia testified that he told the federal agents that his recruiter did not provide him with his name, yet, during the sentencing hearing, he testified that the recruiter provided Valencia with his name.

---

committed under 46 U.S.C. §§ 70503(a) and 70506).  The U.S. Sentencing Guidelines, however, have not been amended to reflect that change.  *See* U.S.S.G. § 5C1.2 (stating that safety-valve relief only applies to defendants convicted "under 21 U.S.C. § 841, § 844, § 846, § 960, or § 963").

Moreover, Valencia was able to provide a physical description of his recruiter during the sentencing hearing, yet he did not supply the federal agents with that information. Accordingly, the record does not demonstrate by a preponderance of the evidence that Valencia truthfully supplied "to the government all the information that he possesse[d] about his involvement in the offense" and all the information he possessed relating to the involvement of others. *See Cruz*, 106 F.3d at 1557. Because Valencia failed to carry his burden demonstrating complete and truthful disclosure to the government, we conclude that the district court did not clearly err and affirm the district court's denial of Valencia's safety-valve relief.

## IV.    CONCLUSION

For the foregoing reasons, we vacate Valencia's sentence and remand to the district court for resentencing as to Valencia's entitlement to a minor-role reduction. The district court is directed to perform an inquiry based on the totality of the circumstances and to consider the factors identified in the commentary to U.S.S.G. § 3B1.2. We affirm the district court's denial of Valencia's request for safety-valve relief.

**VACATED AND REMANDED IN PART, AFFIRMED IN PART.**